# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Trustees of the B.A.C. Local 4 Pension Fund,
Trustees of the B.A.C. Local 5 Pension Fund,
Trustees of the New Jersey B.A.C. Annuity
Fund, Trustees of the New Jersey B.A.C.
Health Fund, Trustees of the New Jersey
BM&P Apprentice and Education Fund,
Trustees of the Bricklayers Trowel Trades
International Pension Fund, and Trustees of
the International Masonry Institute,

        Plaintiffs,

        v.

Nova Crete, Inc.,

        Defendant.

Civil Action No. 19-21470 (RK) (TJB)

**<u>OPINION</u>**

**<u>KIRSCH, District Judge</u>**

    **THIS MATTER** comes before the Court upon a Motion for Summary Judgment filed by Plaintiffs Trustees of the B.A.C. Local 4 Pension Fund, Trustees of the B.A.C. Local 5 Pension Fund, Trustees of the New Jersey B.A.C. Annuity Fund, Trustees of the New Jersey B.A.C. Health Fund, Trustees of the New Jersey BM&P Apprentice and Education Fund, Trustees of the Bricklayers Trowel Trades International Pension Fund, and Trustees of the International Masonry Institute (together, the "Funds"). (ECF No. 39.) In support of their Motion, the Funds filed a moving brief, ("Pls.' Br.", ECF No. 44), a statement of facts, ("Pls.' SOF", ECF No. 43), and supporting exhibits, (ECF Nos. 40–42). Defendant Nova Crete, Inc. ("Nova Crete"), filed a brief in opposition, ("Def.'s Br.", ECF No. 49), supported by a statement of facts, ("Def.'s SOF", ECF No. 49-1), and an exhibit, (ECF No. 49-2). The Funds filed a reply brief. ("Pls.' Reply Br.", ECF

No. 50.) The Court has considered the parties' submissions and decides the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Funds' Motion for Summary Judgment is **DENIED**.

## I.     BACKGROUND

This matter arises from the parties' dispute over whether Nova Crete, a New Jersey corporation and employer, failed to make hourly benefit contributions to the Funds for Nova Crete's employees pursuant to a collective bargaining agreement ("CBA") that the Funds contend bound Nova Crete.

### A.     THE UNION AND THE FUNDS

The Funds are seven jointly-administered multi-employer labor-management trust funds organized and operated pursuant to a trust agreement and various collective bargaining agreements ("CBA") in accordance with the Labor Management Relations Act, 29 U.S.C. § 186, and the Employee Retirement Income Security Act, 29 U.S.C. §§ 1002, 1145. (Def.'s SOF ¶¶ 1–7.)

Relevant to this matter is the CBA between the B.A.C. Administrative District Council of New Jersey (the "Union") and the Building Contractors Association of New Jersey and the Masonry Contractors Association of New Jersey (the "Association CBA"). The Association CBA obligated signatory employers to make benefit contributions to the Funds at specified rates for work performed within the trade and geographic jurisdiction of the Union. (Decl. of John Capo ("Capo Decl.") ¶¶ 13–14, ECF No. 40; "Association CBA", Ex. B to Capo Decl., ECF No. 40-2.) The original Association CBA covered the period from May 1, 2013 through April 30, 2016. (Association CBA at 1.) Two successor CBAs extended the Association CBA for two three-year periods, until April 30, 2022. (Capo Decl. ¶ 18; Ex. C to Capo Decl., ECF No. 40-3; Ex. D to Capo Decl., ECF No. 40-4.)

John Capo ("Capo"), the director of the Union as well as a trustee of the Funds, testified how the Association CBA came about. (Dep. Tr. of John Capo ("Capo Dep."), Ex. L to Decl. of John M. Harras ("Harras Decl.") at 15:19–17:4, 19:18–20:23, ECF No. 42-5.) The Union negotiated the Association CBA with the two employers' associations. (*Id.* at 39:16–24.) Employers do not separately negotiate entering into a CBA with the Union but can sign on to the Association CBA, at which point the employers are bound by the Association CBA and obligated to make contributions under it. (*Id.* at 39:5–15, 40:9–18.) The Union has "field reps" responsible for visiting job sites to attempt to recruit employers to sign on to the Association CBA. (*Id.* at 36:19–37:8.)

### B.   NOVA CRETE AND THE PURPORTED CONTRACT

Nova Crete was a South Amboy, New Jersey concrete installation company that poured concrete, installed stamped concrete, and performed brick and block work on residential and commercial properties in New Jersey, New York, and Pennsylvania. (Def.'s SOF ¶ 8; Dep. Tr. of Manuel Cardoso ("Cardoso Dep.") at 23:23–24:25, Ex. A to Decl. of Ralph R. Smith, ECF No. 49-2.) Before retiring in 2020, Manuel Cardoso ("Cardoso") was the president of Nova Crete, which Cardoso had cofounded in the early 2000s. (*Id.* at 14:23–15:19, 18:8–19.) Nova Crete would normally use its permanent employees for its contracting jobs but would also sometimes use union employees as needed. (*Id.* at 37:11–21.)

The Funds contend that in 2014, Nova Crete signed on to and agreed to be bound by the Association CBA. In support of this position, the Funds rely on a one-page document Cardoso allegedly signed on Nova Crete's behalf (the "Purported Contract"). (Ex. A to Capo Decl., ECF No. 40-1.) The Purported Contract states that "the undersigned Employer has read and hereby approves [the Association CBA] and any successor Collective Bargaining Agreement . . . and

herewith accepts and becomes one of the parties thereto and agrees to be bound by all the terms and conditions" of the Association CBA. (*Id.*) The signatory employer agreed to pay "fringe benefit hourly contributions" as provided in the Association CBA. (*Id.*) The employer name is listed as Nova Crete with an address in South Amboy, New Jersey, contact information, and a federal identification number. (*Id.*) The contact email for Nova Crete is pat@novacrete.com. (*Id.*) Cardoso's printed name and purported signature, dated November 5, 2014, are at the bottom. (*Id.*) Above the signature block is a spot for the signatory employer to initial, confirming they have received a copy of the Association CBA. (*Id.*) Below that, Kevin Duncan ("Duncan") signed as the "Local President" and Richard Tolson signed as the "District Counsel Director." (*Id.*)

Nova Crete's sole evidence submitted in connection with its opposition to the Funds' Motion is the deposition testimony of Cardoso, Nova Crete's co-founder and former president. Cardoso testified he had not seen the Purported Contract before, he did not remember reviewing it with any Nova Crete employee, did not recall signing it, and did not recognize the signature as his own. (Cardoso Dep. at 25:18–26:12, 60:22–61:19.) Asked several times throughout the deposition whether he had signed the document, Cardoso repeatedly testified that he was "not sure if [he] did sign that one," (*id.* at 26:4–7), that it was "not [his] typical signature," (*id.* at 28:3–9), and that he "firm[ly] believe[d]" he did not sign the Purported Contract, (*id.* at 34:23–25). Asked whether the signature was therefore a forgery, Cardoso agreed it was either a forgery or someone else did it on his behalf. (*Id.* at 66:7–15.)[1]

---

[1] The Funds' attorney questioning Cardoso had him sign his name at the deposition, and the attorneys and Cardoso disagreed whether that signature matched the one appearing on the Purported Contract. (Cardoso Dep. at 28:8–30:16.) Cardoso was also shown several checks Nova Crete had issued, which he testified had either been signed by his son or someone else who Cardoso could not determine. (*Id.* at 30:17–34:3.) The parties did not submit any samples of Cardoso's signature or any expert testimony regarding the signature in connection with the Funds' Motion for Summary Judgment.

Cardoso acknowledged that he was not the only Nova Crete employee responsible for signing documents on the company's behalf. Cardoso testified that his ability to write and comprehend English were "lack[ing]," he acted as the company "foreman" while someone else always prepared the paperwork for Cardoso to then review. (*Id.* at 7:14–17, 15:11–19.) Cardoso identified Patricia Daimo ("Daimo")—whose email address is listed for Nova Crete on the Purported Contract—as an employee who helped him with tasks involving reading and writing in English. (*Id.* at 26:13–25; *see also* Purported Contract.)[2] Cardoso testified that Daimo would regularly fill out paperwork for him to sign. (Cardoso Dep. at 27:2–18.) However, Cardoso also testified that Daimo's work was limited to filling out paperwork and that she was never authorized to bind Nova Crete to contracts. (*Id.* at 31:14–21.)

Cardoso also repeatedly testified that he would not have signed on to the Association CBA had he understood its intended scope because he would never agree to use union laborers for residential (as opposed to commercial) projects. Cardoso testified that 80% of Nova Crete's work was on residential projects. (*Id.* at 57:6–25, 58:2–15, 72:23–73:15.) Based on conversations Cardoso had with union representatives over the years and "papers" sent to the Nova Crete office, Cardoso believed that residential work was outside the scope of what any union CBA would cover. (*Id.* at 61:20–66:6.) Cardoso recalled discussing with a union representative Cardoso's unwillingness to sign on to the Association CBA if it would cover residential work. (*Id.* at 73:16–74:13.)

Cardoso testified that while he never signed on to the Association CBA for the concrete work Nova Crete performed, Cardoso would sometimes hire workers from the local union chapters

---

[2] At Cardoso's deposition, the transcript refers to "Patricia Diamond" and "Patricia Daino" at times. Cardoso later confirmed that at each point he was referring to "Pat," the Nova Crete employee who would handle his office work and whose email address appears on the Purported Contract. (Cardoso Dep. at 52:2–18.)

for *ad hoc* jobs. (*Id.* at 19:7–20:14.) Cardoso testified that he entered into "job agreements" over the years for specific jobs. (*Id.* at 20:15–22:3.) When Cardoso used union employees, he would remit contributions to the unions, but only on union jobs. (*Id.* at 21:840:2–15, 47:21–24.) Capo, the Union director, agreed that the Local 4 and 5 union branches would sometimes enter specific job agreements with companies where a company would commit to only make payments to the Funds for specific jobs but testified that he was not aware of either branch ever entering such a one-off agreement with Nova Crete. (Capo Dep. at 35:8–22.)

Apart from the Purported Contract itself, the Funds rely on the testimony of two witnesses to establish that Nova Crete signed on to the Association CBA. Capo had no personal involvement with Nova Crete and could not testify about the negotiations leading up to Cardoso allegedly signing the Purported Contract or when Nova Crete allegedly signed on to it. (*Id.* at 36:3–14.) Capo identified the names of the signatories on the Purported Contract who signed on the Union's behalf: Duncan was a Union field rep and Richard Tolson was the President of the Union in 2014. (*Id.* at 51:2–52:10.) Although not familiar with the specific Purported Contract or Nova Crete, Capo testified that he was not aware of any instance in which a union official forged the signature of a signatory company, (*id.* at 52:17–53:1), did not believe that field reps had authority to exclude certain types of jobs—like residential work—from the scope of the CBA before employers signed on, (*id.* at 41:15–43:15), and believed that the underlying CBA would have been presented to a company at the time it was asked to sign on, (*id.* at 49:20–50:1).

Duncan, the field rep who signed the Purported Contract, was also deposed. (Dep. Tr. of Kevin Duncan ("Duncan Dep."), Ex. M to Harras Decl., ECF No. 42-6.) Duncan encountered Nova Crete at a jobsite in Neptune, New Jersey at a date between 2013 and 2015. (*Id.* at 34:17–38:2, 58:12–24.) Duncan confirmed his signature and initials on the Purported Contract but did

not specifically recall signing or providing it to Nova Crete. (*Id.* at 43:1–16.) Duncan testified that he "would have either" given Nova Crete's executive hard copies of the Association CBA and the signature page at the worksite or had an office administrator email them to Nova Crete, as "everything was done electronically." (*Id.* at 38:11–23.) Duncan did not recall receiving the signature page from Nova Crete but testified that he "guess[ed] . . . they sent the signature page." (*Id.* at 38:5–11.) Duncan had no conversation with Cardoso about signing the document but testified that Nova Crete would have "had to sign [the Purported Contract] and send it back electronically." (*Id.* at 46:8–13.) Duncan could not confirm that the handwriting on the Purported Contract belonged to Cardoso. (*Id.* at 45:1–46:17; 62:16–63:11.) Duncan testified that employers sometimes agreed to be bound to a CBA *ad hoc* for job-specific projects but that he did not interact with Nova Crete and thus did not know whether Nova Crete had ever signed such *ad hoc* agreements. (*Id.* at 58:25–60:17.)

### C.    THE FUNDS' AUDIT OF NOVA CRETE'S 2016 RECORDS

In 2019, the Funds reviewed Nova Crete's books and records for the year 2016 to confirm it had made the required contributions to the Funds. (Capo Decl. ¶ 24.)[3] In his declaration, Capo stated that the review was conducted "pursuant to" the Purported Contract and Association CBA. (*Id.*) Asked about how the audit came about at his deposition, Cardoso stated that it occurred without his consent. Cardoso testified that when the auditors came to Nova Crete's office, Daimo

---

[3] The Court notes that the cover letter to the "Independent Accountant's Report on Applying Agreed-Upon Procedures," written by the auditing firm to the Funds, states that the firm was "not engaged to and did not conduct an audit, the objective of which would be the expression of an opinion on whether the Employer remitted contributions to the Funds in accordance with the applicable [CBA]." (Ex. F to Decl. of Tony Sgroi ("Sgroi Decl.") at 2, ECF No. 41-1.) The letter states further that the firm "make[s] no representation regarding the sufficiency of the procedures described below either for the purpose for which this report has been requested or for any other purpose." (*Id.* at 1.)

However, the parties both refer to the 2016 review of Nova Crete's books as an "audit." In the interest of simplicity, the Court will do same, while bearing in mind the above limitations to the audit.

"was abused by the auditor forcing her" off of her chair, at which point the auditor "went into [Cardoso's] computer . . . ." (Cardoso Dep. at 50:3–8.) Cardoso further testified that before conducting the audit, the Union representatives should have "let [him] know the intentions" and "let [him] know what[] [was] going on" rather than showing up at the office when Cardoso was not present. (*Id.* at 50:12–13.)

In support of its audit of Nova Crete, the Funds submitted a declaration from Tony Sgroi, the director of the payroll auditing department at the auditing firm Schultheis & Panettieri LLP. ("Sgroi Decl." ¶ 3, ECF No. 41.) The audit was conducted in August 2019 and covered the period from January 1 to December 31, 2016. (*Id.* ¶ 5.) The auditors reviewed Nova Crete's payroll records "to determine the number of hours of Covered Work performed by each employee" for the relevant period and then "reviewed the Funds' records to determine whether contributions had been received for each of those hours worked." (*Id.* ¶¶ 6–7.) For those hours of Covered Work that the auditors determined Nova Crete failed to make required contributions, the auditors calculated the missing principal, interest, liquidated damages, and audit costs permitted by the Association CBA. (*Id.* ¶¶ 8–9.)

The auditors' records include thirty pages of calculations upon which the auditors relied to reach their conclusions. (*Id.* ¶ 11; *see* Audit Documentation, Ex. F to Sgroi Decl., ECF No. 41-1.)[4] The first set of records are the "Fringe Benefit Deficiency" calculations for each Nova Crete employee, split up by month and by union branches (the Local 2, Local 4, and Local 5). (*Id.* at *5–14.)[5] For example, the first page of these records indicate that in July 2016, Carlos Caspao worked

---

[4] The Court notes that neither Sgroi's declaration nor any other materials the Funds submitted in support of their Motion for Summary Judgment explain the Audit Documentation in any detail, instead summarizing the total deficiency identified and what the Funds believed Nova Crete owed as a result. The Court is therefore left to interpret the documentation as best it can without the Funds' guidance.

[5] Pin-cites preceded by an asterisk refer to the page numbers in the CM/ECF header.

116 hours for Nova Crete, 102 of which were reported to the Local 2, leaving 14 unreported hours. (*Id.* at *5.) In total, the report showed that: for the Local 2, Nova Crete reported 508.5 hours and failed to report 160.5 hours, (*id.* at *6); for the Local 4, Nova Crete reported 0 hours and failed to report 492.5 hours, (*id.* at *7); and for the Local 5, Nova Crete reported 120 hours and failed to report 11,850.25 hours, (*id.* at *14). Therefore, in total, the auditor found that Nova Crete reported 628.5 hours and failed to report 12,449.25 hours. (*Id.* at *14.)

The next set of included records are the "Fringe Benefit Deficiency Int'l Allocation" calculations for each employee, which show how much principal in benefits were not paid for each set of unreported hours. (*Id.* at *15–30.) From this, the auditors calculated that Nova Crete owed $425,216.22 in unpaid principal fringe benefits, $290,749.33 in interest payments, and $85,043.25 in liquidated damages as of December 19, 2022. (Ex. G to Sgroi Decl., ECF No. 41-2.) Including the $6,737.40 cost of the audit, the auditors concluded that Nova Crete owed $807,746.20 to the Funds. (*Id.*)

### D.    PROCEDURAL HISTORY

The Funds filed suit on December 17, 2019 pursuant to Sections 502(a)(3) and 515 of the Employee Retirement Income Security Act ("ERISA") of 1974, as amended, 29 U.S.C. §§ 1132(a)(3), 1145, and Section 301 of the Labor-Management Relations Act ("LMRA") of 1947, 29 U.S.C. § 185. (Compl., ECF No. 1 ¶ 1.) They currently seek summary judgment on their claims against Nova Crete, arguing that Nova Crete was bound by the Association CBA and failed to make $425,216.22 in benefit contributions under the CBA for its employees during 2016. (ECF No. 39.) The Funds moving papers assert that the total amount Nova Crete now owes is $1,081,612.58. (Pls.' SOF ¶ 30.)[6]

---

[6] It is unclear how the Funds reached the $1,081,612.58 figure they request on summary judgment. The auditors calculated that Nova Crete owes $807,746.20, which includes delinquent benefit contributions of

## II.     **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 provides that the Court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must "view[] the facts in the light most favorable to the party against whom summary judgment was entered." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). A "material fact" is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine dispute" about a fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248. Summary judgment should be denied "[i]f reasonable minds could differ as to the import of the evidence." *Id.* at 250–51. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino*, 358 F.3d at 247 (quoting *Anderson*, 477 U.S. at 255).

The party moving for summary judgment has the initial burden of establishing its right to summary judgment. *See Celotex Corp.*, 477 U.S. at 323. To show that a material fact is not genuinely disputed, it "must . . . cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The moving party may also meet this burden by

---

$425,216.22, interest of $290,749.33, liquidated damages of $85,043.25, and audit costs of $6,737.40. (Pls.' SOF ¶ 27; Sgroi Decl. ¶ 15.) $68,160.30 reflect the Funds' attorney's fees, which amount is supported by a declaration from the Funds' attorney. (Pls.' SOF ¶¶ 28–29.) This leaves a $205,706.08 remaining for which the Court is unable to account.

"showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

Once the movant meets its threshold burden under Rule 56, the non-moving party must present evidence to establish a genuine issue as to a material fact. *See Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the non-movant "must do more than simply show that there is some metaphysical doubt as to material facts"). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990).

## III.   **DISCUSSION**

This action centers on one question: whether Nova Crete was bound to the Association CBA such that it was required to make fringe benefit contributions to the Funds for all of its employees in 2016 under the Association CBA. Section 515 of ERISA requires employers who sign on to a CBA to comply with the terms of the agreement, providing:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. Section 502 of ERISA provides that upon a finding that an employer violated Section 515, the multiemployer plan is entitled to judgment for the amount of delinquent contributions plus interest and liquidated damages at rates prescribed by the documents and instruments governing the plan, as well as the reasonable attorneys' fees and costs incurred by the plan in prosecuting the action. 29 U.S.C. § 1132; *see also Bd. of Trustees of the Int'l Union of*

*Operating Engineers Loc. 825 Pension Fund v. River Front Recycling Aggregate, LLC*, No. 15-8957, 2016 WL 6804869, at *2 (D.N.J. Nov. 16, 2016).

The Funds offer evidence that Nova Crete was bound to make benefit contributions under the Association CBA and failed to make the requisite contributions in 2016 in the principal amount of $425,216.22. The Funds seek an award of $1,081,612.58 on summary judgment. Nova Crete's primary objection to the Funds' Motion for Summary Judgment is that Cardoso never signed the Purported Contract binding Nova Crete to the Association CBA, or alternatively that his signature was procured through fraud.[7] For the reasons set forth below, the Court finds that the Funds have failed to carry their burden to show their entitlement to summary judgment because it has not demonstrated that no genuine issue exists regarding whether Nova Crete was bound by the Association CBA.

### A.    WHETHER NOVA CRETE AGREED TO THE ASSOCIATION CBA

As a general matter, an employer may sign on to a previously-negotiated CBA through a "me too agreement" that binds the employer to the terms of the CBA without the employer and the union having to separately negotiate terms. The Third Circuit has explained that "a 'me too' agreement is an agreement whereby an employer who is not a member of [a trade association] agrees with a union to be bound by the terms of a [national wage agreement]." *Int'l Union of Bricklayers and Allied Craftworkers, Loc. 5 v. Banta Tile & Marble Co.*, 344 F. App'x 770, 773 (3d Cir. 2009) (quoting *Berwind Corp. v. Comm'r of Soc. Sec.*, 307 F.3d 222, 237 n.18 (3d Cir. 2002)). This type of agreement "has terms identical to the terms of [a national wage agreement] and there is no distinction regarding an employer's contractual rights and obligations. Thus, the

---

[7] Defendant generally does not dispute the Funds' calculation of delinquent contributions, interest, liquidated damages, or attorney's fees and costs except for a passing assertion that the Union's auditor counted hours worked that were outside the scope of the Association CBA. (Def.'s Br. at 3.)

distinction between a . . . signatory [to the national wage agreement] and a 'me too' signatory is without a difference." *Id.* (quoting *Berwind Corp.*, 307 F.3d at 237 n.18); *see also Bd. of Trustees of the Int'l Union of Operating Engineers Loc. 825 Pension Fund v. River Front Recycling Aggregate, LLC*, No. 15-8957, 2016 WL 6804869, at *5 (D.N.J. Nov. 16, 2016) ("The basic purpose of these agreements is to allow these small, independent employers to obtain all the benefits of the standard [CBA] that is negotiated by the principal employers in the industry without having to . . . engage in separate negotiations . . . ." (citing *Ariz. Laborers Local 395 Health and Welfare Trust Fund v. Conquer Cartage Co.*, 753 F.2d 1512, 1518–19 (9th Cir. 1985))). Such agreements may be binding even if they are entered into by an employer signing a one-page agreement. *See id.* (enforcing one-page me too agreement to a CBA).

The Funds argue that "me too agreements," like the one-page Purported Contract the Funds contend Cardoso signed on Nova Crete's behalf, are commonly enforced and should be here for two reasons. (Pls.' Br. at 7–8.) *First*, the Funds argue that there is sufficient evidence that Cardoso signed the one-page "me too" Purported Contract. (*Id.* at 8–9.) *Second*, the Funds argue that even if Cardoso did not sign the agreement, Nova Crete manifested an intent to be bound by submitting to an audit under the CBA, remitting contributions to the Funds in accordance with the CBA, and continuing to avail itself of union labor under the CBA. (*Id.* at 9–10.)

Nova Crete contends that the Funds have failed to meet their burden to establish that Nova Crete agreed to be bound by the Association CBA. Nova Crete argues that no one from Nova Crete ever signed the Purported Contract or had ever received a copy of the Association CBA in connection with the purported signing. (Def.'s Br. at 5.) Nova Crete does not directly counter the Funds argument that Nova Crete manifested an intent to be bound to the Association CBA by its

actions, but rather argues that Nova Crete can establish a fraud-in-the-execution defense that precludes summary judgment for the Funds. (*Id.* at 6–9.)

The Court finds that the Funds have failed to carry their burden on summary judgment to show either that no material dispute exists over whether Cardoso signed the Purported Contract or that Nova Crete manifested an intent to be bound by the Association CBA by its actions.

   1. <u>Whether Cardoso Signed the Purported Contract</u>

To argue that Cardoso signed the Purported Contract, the Funds rely primarily on the document itself, i.e. "evidence of the signature on the CBA signature page." (Pls.' Reply Br. at 4.) The Purported Contract lists Nova Crete's contact information, federal employment number, and insurance carrier and policy information. (Purported Contract.) Cardoso confirmed that the email address listed on the Purported Contract, for pat@novacrete.com, (*id.*), was the email address of his office manager, (Cardoso Dep. at 26:20–25). One of the signatories on the union's behalf, the field rep Duncan, recalled interacting with Nova Crete at a jobsite once at some point over a several-year span around the time of the Purported Contract's signing, confirmed his signature and initials on the Purported Contract, and testified to the general procedure the Union used to get employers to sign on to the Associated CBA. (Duncan Dep. at 34:17–38:2, 43:1–16, 58:12–24.) Cardoso's purported signature, bolstered by Nova Crete's contact information and general testimony about the Union's functioning, is sufficient to meet the Funds' moving obligation to "cit[e] to particular parts of materials in the record" that show the "absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

However, Nova Crete disputes the authenticity of Cardoso's signature on the Purported Contract. Throughout his deposition, Cardoso repeatedly denied that he had ever seen or signed the Purported Contract. Asked first if "[a]t any point in time during your operation of Nova Crete,

did you sign a collective bargaining agreement," Cardoso responded "No." (Cardoso Dep. at 20:15–19.) Cardoso testified "I don't remember signing this paper. I see everything is writing there, I don't see my writing anywhere." (*Id.* at 25:21–24.) Asked immediately after it was his signature, Cardoso testified "Very vague. Don't look exactly the way I sign, so I'm not sure if I did sign that one." (*Id.* at 26:4–7.) Asked if the signature was therefore a forgery, Cardoso said "I don't say it's a forgery, but I don't see any - - anything of my writing there. Because this - - I don't remember sign this." (*Id.* at 26:8–12.) Later again, Cardoso was shown the Purported Contract, asked if he signed it, to which he responded "I'm firm [sic] believe I didn't." (*Id.* at 34:23–25.)

Cardoso grounded his belief that he did not sign the Purported Contract with specific reasons why he would not sign on to the Association CBA. Cardoso repeatedly testified that he would not have signed on to a CBA that would compel him to use union laborers for residential projects, which constituted the majority of Nova Crete's work. (*Id.* at 57:6–25, 58:2–15, 72:23–73:15.) Cardoso acknowledged using union labor over the years but only through limited "job agreements" for specific jobs. (*Id.* at 20:15–24.) Capo agreed that the union chapters would sometimes enter specific job agreements with companies where a company would commit to only make payments to funds for specific jobs. (Capo Dep. at 35:8–22; *see also* Pls.' SOF ¶ 9 (agreeing that from 2004 to 2016, Nova Crete entered *ad hoc* agreements with the union for specific construction projects).) The parties agree that the Purported Contract was not such an *ad hoc* agreement but rather would have bound Nova Crete to the Association CBA for all the company's work.

Cardoso's testimony is sufficient to create a disputed material fact over whether he signed the Purported Contract. Cardoso denied ever binding Nova Crete to the Association CBA that would require him to make contributions for every employee for every job. While later in the

deposition Cardoso denied *remembering* signing the Association CBA—rather than affirmatively denying signing it—this makes sense given the eight years that had elapsed between the date Cardoso allegedly signed the Association CBA and the date of his deposition.[8] The fact that Nova Crete's jobs primarily involved residential properties for which Cardoso did not want to be bound to union labor, and the fact that Nova Crete was permitted to enter *ad hoc* agreements with the Union over a lengthy period of time, support Cardoso's claim that he would have had no incentive to sign on to the full Association CBA for all of his employees with all jobs.[9]

Cardoso's testimony may have been insufficient to establish a genuine issue requiring jury resolution over his signature had the Funds' evidence been stronger. As noted above, the Funds' evidence solely constitutes the signed Purported Contract and testimony from the union field rep, Duncan, identifying his signature on the contract. Duncan testified that he recalled encountering Nova Crete employees on a jobsite once between 2013 and 2015 but had no recollection of discussing the CBA with them or signing the Purported Contract. (Duncan Dep. at 34:17–38:2, 58:12–24.) Duncan and Capo were able to testify about how union officials generally approached employers to get them to sign on the CBA, (Capo Dep. at 49:20–50:1; Duncan Dep. at 38:11–23), but were unable to testify that this procedure was followed with Nova Crete, (Capo Dep. at 36:3–14; Duncan Dep. at 43:1–16, 46:8–13).The Funds offer no evidence beyond the one-page sheet itself confirming that it was ever transmitted to Nova Crete, either through an email or fax showing

---

[8] The Court also notes that some perceived ambivalence in Cardoso's answers may be attributable to the fact that English is not his primary language. Asked during his deposition whether he would like an interpreter for the deposition, Cardoso responded "[t]hat be better. If you wanna go strictly to lawyers' language, that be better." (Cardoso Dep. at 13:5–12.) The deposition proceeded without a translator, and therefore the Court is hesitant to read too much into subtle distinctions in how Cardoso phrased his denials.

[9] Although not argued by the Funds, the Court also considers the possibility that Daimo, Nova Crete's office manager, signed the Association CBA on Cardoso's behalf. Cardoso agreed that Daimo would fill out forms on his behalf, given her role helping Cardoso read and write English. (Cardoso Dep. at 26:13–22.) However, Cardoso denied that Daimo had authority to bind the company to a contract or to sign the Association CBA on his behalf. (*Id.* at 31:14–17.)

the signed Purported Contract or underlying Association CBA were transmitted to Nova Crete, despite Duncan's testimony that "everything was done electronically." (*Id.* at 38:11–23.) The Funds also offered no evidence that the signature was in fact Cardoso's—either through production of samples of Cardoso's handwriting or expert testimony—despite inquiry at Cardoso's deposition regarding the signature. (Cardoso Dep. at 28:8–34:3.) This is not to say this evidence was required to meet their moving burden, but if the Funds' claim that Cardoso signed the Purported Contract was bolstered by any additional circumstantial evidence described above, Cardoso's testimony would have, by itself, been less likely to undermine the Funds' evidence.

In their Reply, the Funds challenge Nova Crete's opposition arguments as relying too heavily on Cardoso's "self-serving" testimony that cannot overcome the Funds' "evidence-backed deposition testimony." (Pls.' Reply Br. at 4–5.) The Third Circuit instructs that "[a]s a general proposition, 'conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.'" *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012) (quoting *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009)). In *Gonzalez*, the non-movant opposed summary judgment—in which the relevant question was whether the non-movant had lied to immigration authorities when he disclaimed being the father of two children—by relying on his sworn statement that he did not believe he was their father at the time. *Gonzalez*, 678 F.3d at 261–63. The Third Circuit held that the district court properly discounted the appellant's statement because it was contradicted by the overwhelming weight of the circumstantial evidence demonstrating that the non-movant acted like the children's father. *Id.* at 263–64.[10] The Third Circuit found that this general principle did not apply in *Kirleis*, in which

---

[10] Specifically, the Third Circuit cited that fact that the non-movant was in a relationship with the children's mother at the time the children were conceived, financially supported the mother during the pregnancy until the present, was told by the mother that he was the father, took tax deductions for the children, permitted

the relevant question was whether an employee shareholder of a firm had received a copy of the firm's bylaws at the time she became a shareholder, such that she could be compelled to arbitrate her claims based on an arbitration provision contained in the bylaws. *Kirleis*, 560 F.3d at 159–60. The Court held that the plaintiff's admittedly self-serving statement that she had never received the bylaws was sufficient to create a genuine issue of material fact regarding the plaintiff's agreement to arbitrate, despite the movant's argument that the plaintiff had constructive knowledge of the bylaws through the plaintiffs acceptance of compensation and a number of perquisites under the bylaws. *Id.* at 161. The Court wrote that "[f]ar from a conclusory statement that she never agreed to arbitrate, [the plaintiff] details the specific circumstances that rendered the formation of an agreement to arbitrate impossible" and held that whether the plaintiff had received the bylaws was a credibility question requiring jury resolution. *Id.* at 161–62.

The Court finds that the balance of the parties' evidence is more similar to that described in *Kirleis* rather than *Gonzalez*. The Funds' evidence that Cardoso signed the Purported Contract is much weaker than the government's evidence in *Gonzalez* that the non-movant had lied about his parenthood and stronger than the defendant's evidence in *Kirleis* that the plaintiff had received a copy of the firm bylaws. *See Gonzalez*, 678 F.3d at 261–63; *Kirleis*, 560 F.3d at 161. Likewise, Cardoso's opposition to the Funds' evidence of his signature is better founded than the evidence the non-movant offered in *Gonzalez* and as strong as the plaintiff's evidence in *Kirleis*. *Id.* Therefore, the Court disagrees with the Funds that the self-serving nature of Cardoso's deposition testimony prevents the Court from relying on it in denying the Funds' Motion.[11]

---

the children to call him "dad," and later amended their birth certificates to show himself as the biological father. *Gonzalez*, 678 F.3d at 263–64.

[11] Although not raised by the Funds, the Court is aware of cases holding generally that mere claims that a witness cannot remember signing a document are insufficient to create an issue of material fact over whether the witness actually signed the document. "With respect to contractual disputes, federal courts have consistently held that a party's claimed failure to recall is insufficient to raise an issue as to contract

Finally, the Funds make public policy arguments, contending that through ERISA and the LMRA, Congress extended the Funds "special protection from delinquent employers that dispute the validity of written contracts." (Pls.' Br. at 11–12.) Indeed, the Third Circuit has found that ERISA reflects congressional purpose of "ensur[ing] that benefit plans are able to rely on contribution promises of employers 'because plans must pay out to beneficiaries whether or not employers live up to their obligations.'" *Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1103 (3rd Cir. 1996) (quoting *Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 314 (2d Cir. 1990)). However, the question on summary judgment is whether Nova Crete made a promise to the Union in the first place. Absent an ability to resolve that question now, the policy interests the Funds argue are not triggered.

Therefore, the Court finds that Nova Crete has met its burden of establishing a genuine issue of material fact as to whether Cardoso signed the Purported Contract. *See Anderson*, 477 U.S. at 248. Viewing the evidence in the light most favorable to Nova Crete, summary judgment on this question is inappropriate at this stage.

### 2.     Whether Nova Crete Manifested an Intent to Be Bound

The Funds argue that even if Cardoso did not sign the Purported Contract, Nova Crete nonetheless manifested an intent to be bound by the CBA through its conduct. (Pls.' Br. at 10.)

---

formation." *Argun v. Neiman Marcus Grp., Inc.*, No. 19-14548, 2020 WL 1272247, at *9 (D.N.J. Mar. 16, 2020) (citations omitted); *see also 44A Trump Int'l, Inc. v. IncNetworks Inc.*, No. 12-2292, 2014 WL 495145, at *3 (D.N.J. Feb. 6, 2014) (holding that non-movant's "mere allegations of possible forged signatures and invalid documents" were insufficient to preclude summary judgment). However, these cases are distinguishable. The Funds' evidence that Cardoso signed the Purported Contract is weaker than the movants' evidence in *Argun*, where the movant submitted evidence that the plaintiff had twice received and physically signed the contested arbitration agreement and later twice received and e-signed same by logging on to the defendant's website using a unique sign-in number and self-created password. 2020 WL 1272247, at *2–5. The defendant's "mere allegations of possible forged signatures and invalid documents" contained in *44A Trump Int'l, Inc.* were "raised for the first time in [the defendant's] opposition brief" and unsupported by any evidence on the record, 2014 WL 495145, at *3, unlike Nova Crete's evidence here.

The Funds contend that Nova Crete's intent can be discerned from three facts: Nova Crete "submitt[ed] to an audit under the CBA, remitt[ed]contributions to the Funds in accordance [with] the CBAs, and continu[ed] to avail itself of Union labor under the CBAs." (*Id.*) Nova Crete generally denies that Nova Crete was bound by the CBA, (Def.'s Br. at 5), but does not specifically address the Funds' manifestation of intent theory.

An employer may be bound by a CBA even without having signed it. To bind an employer in the absence of a writing evidencing the employer's intent to be bound, "[a]ll that is required is conduct manifesting an intention to abide and be bound by the terms of an agreement." *N.J. Reg'l Council of Carpenters v. Jayeff Const. Corp.*, 495 F. App'x 230, 233 (3d Cir. 2012) (quoting *Bricklayers Local 21 of Ill. Apprenticeship & Training Program v. Banner Restoration, Inc.*, 385 F.3d 761, 766 (7th Cir. 2004)). The Third Circuit has instructed that a court in this circumstance should look for "(1) a writing that clearly refers to the CBA and (2) conduct of the defendant that 'evidences an intent to be bound by the [CBA] despite a lack of written consent.'" *Id.* (quoting *Residential Reroofers Local 30-B Health & Welfare Fund v. A & B Metal & Roofing, Inc.*, 976 F. Supp. 341, 344 (E.D. Pa. 1997)). While this opinion is non-precedential, the Court finds the reasoning persuasive and adopts same.

The Court finds that the Funds have failed to establish either element present here, such that, assuming Cardoso never signed the Purported Contract, Nova Crete can nonetheless be bound to the Association CBA. At the outset, the first prong requires a "writing that clearly refers to the CBA." *Id.* The Funds' alternative argument about Nova Crete's intent to be bound is premised on Cardoso not having signed the Purported Contract. The Third Circuit's decision in *Jayeff Const. Corp.* only considered whether the employer's conduct evidenced an intent to be bound after noting that the employer had executed a writing (a remittance form) referencing the CBA. *Id.* at

231, 234. The cases the Funds cite in support of its manifestation of intent theory are distinguishable in that they all involve a writing referencing the CBA. *See Brown v. C. Volante Corp.*, 194 F.3d 351, 353 (2d Cir. 1999) (employer had signed an initial three-year CBA and remitted contributions for the following six years despite not signing CBA renewals); *Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 311 (2d Cir. 1990) (employer had signed thirty years of CBAs but contended that they were not bound by later ones because the union had abandoned them). "Absent a prior or expired CBA, courts have applied the 'course of conduct' theory where there existed other specific promises, assents, agreements, memorandums or agreement or similar formal writings referencing the CBA or benefit agreements." *A & B Metal & Roofing, Inc.*, 976 F. Supp. at 344 (discussed favorably in *Jayeff Const. Corp.*, 495 F. App'x at 233). Discounting the Purported Contract, as the evidence viewed in in the light most favorable to Nova Crete suggests Cardoso never signed it, the Funds point to no such writing with a clear reference to the Association CBA that could support this theory of liability.

The Funds also fail to carry their moving burden on the second element—a manifestation of intent to be bound—because Nova Crete's three actions that the Funds rely on to show Nova Crete's purported manifestation of intent to be bound are not supported by undisputed facts on the record. First, the Court finds a factual dispute over whether Nova Crete "submit[ted]" to an audit under the CBA. (Pls.' Br. at 10.) The Court notes a distinction between the Funds *conducting* an audit and Nova Crete *submitting to* one. A union may conduct an audit of an employer's books and records by seizing them for review, even where the employer has not consented to the audit. In that situation, while the union my undeniably have conducted an audit, it is hard to say how carrying out the audit supports an inference that the employer believed that it was bound by a CBA requiring employers to submit to an audit.

Here, in August 2019, the Funds undeniably audited Nova Crete's payroll records for the year 2016. (Sgroi Decl. ¶¶ 5–6.) However, no declaration, submitted by the Funds' employees, auditor, or lawyer, offers information supporting an inference that Nova Crete *submitted to* an audit. Indeed, nothing the Funds provided describe any of the relevant facts or circumstances giving rise to the audit. Instead, Nova Crete contends that it "was forced at great inconvenience to undergo an audit." (Def.'s SOF ¶ 21.) Asked about the audit at his deposition, Cardoso testified that Daimo "was abused by the auditor," who "forc[ed] her" off her chair in order to access Cardoso's computer and that the Union representatives had not sought his permission for the audit ahead of time. (Cardoso Dep. at 50:3–13.) Although the record describing how the audit came about is not fully developed, the facts the parties have submitted—viewed in the non-movant's favor—create the impression that the Funds strong-armed Daimo into turning over the records. Without any evidence that Nova Crete agreed to turn over its books and records, and in light of Cardoso's uncontradicted testimony that the company's records were not turned over voluntarily, it is impossible to assume from the mere fact that an audit took place that Nova Crete implicitly acknowledged it was required to be audited under the CBA.

The other two facts the Funds rely on—Nova Crete making benefit contributions and using union labor—are more consistent with Nova Crete hiring union laborers through *ad hoc*, job-specific agreements than with Nova Crete implicitly acknowledging that it was bound by the CBA for all its employees on all jobs. The parties agree that Nova Crete occasionally used union laborers for specific job agreements and made contributions to the union funds for those jobs. (Pls.' SOF ¶ 9; Def.'s SOF ¶ 9.) At his deposition, Cardoso explained that Nova Crete entered "sign[ed] job agreements as needed" over the years, (Cardoso Dep. at 20:19–24), and would make union contributions for those jobs, (*id.* at 21:11–13, 23:8–14).

The auditors' findings that Nova Crete employed union laborers and made contributions to the Funds are consistent with this undisputed practice. For each employee of each month of 2016 of each union branch, the auditor's report listed the number of hours Nova Crete's records showed the employee worked and the number of hours reported to the union. (Audit Documentation at *5–14.) The auditor found, in total, that Nova Crete reported 628.5 hours and failed to report 12,449.25 hours. (*Id.* at *14.) Put differently, the auditor found that Nova Crete reported and paid contributions on approximately 5% of the hours its employees worked. The Court concludes that Nova Crete's decision to make contributions for 5% of the hours its employees worked does not evidence an intent to be bound by the full CBA. Indeed, this 5% contribution rate is more consistent with Nova Crete only making contributions for specific projects under *ad hoc* agreements, as both parties agree Nova Crete did on occasion. (Pls.' SOF ¶ 9 ("Initially from 2004 to 2016, Defendant signed agreements with [the Union] on an *ad hoc* basis . . . .").)

The Funds do not attempt to explain what portion of the audit records support their conclusion that Nova Crete made contributions and hired union laborers *pursuant to the CBA* rather than the admitted *ad hoc* agreements. The Funds' opening and reply briefs cite paragraphs 28 and 29 of Capo's declaration on this point. (Pls.' Br. at 3, 10 (citing Pls.' SOF ¶ 21 (citing Capo. Decl. ¶¶ 28–29)); Pls.' Reply Br. at 3, 7.) In those paragraphs, Capo declares that Nova Crete "has remitted some contributions to the Funds pursuant to the CBA," (Capo Decl. ¶ 28), and "at all relevant times, utilized labor from the Union pursuant to the CBA," (*id.* ¶ 29). However, these bare assertions that Nova Crete's actions were taken "pursuant to the CBA" do not explain why Capo believes Nova Crete's contributions for 5% of its employees' worked hours could not be accounted for by the *ad hoc* agreements the Funds concede the Union entered into with Nova Crete on occasion. (*See* Pls.' SOF ¶ 9.) Likewise, the Funds' auditors review of Nova Crete's payroll

records appears premised on the assumption that all hours worked by Nova Crete employees in 2016 on any job were "hours of Covered Work performed by each employee of Defendant for the period of January 1, 2016 through December 31, 2016." (Sgori Decl. ¶ 6.)

The Funds argue that a pair of Second Circuit cases in which the court found that a defendant employer had manifested an intent to be bound by a CBA through its conduct are "highly analogous" to the case at bar. (Pls.' Br. at 10–11.) However, both cases are distinguishable. In *Brown*, it was uncontested that the defendant employer had signed on to the CBA from 1987 to 1990, but the defendant argued that it was not bound for two subsequent three-year periods because it had not re-signed subsequent CBAs. 194 F.3d at 353. The Court found the employer had manifested an intent to be bound for the subsequent six years by submitting monthly remittance reports that said they were expressly submitted "[i]n accordance with the terms of" the CBAs, making payments in accordance with the CBA's rates, offering "cooperation" with the audit, and "acknowledging" the employer's "responsibility to the funds" in a letter. *Id.* at 354–55. The Funds' evidence of intent falls far short of the overwhelming proof in *Brown*. In the other Second Circuit case, *Benson*, the employer had signed on to a series of CBAs for over thirty years, but eventually argued that the union had abandoned the CBA and that the employer was not obligated to make contributions for the post-abandonment time period. 907 F.2d at 311, 314–16. The court never addressed the question of whether to enforce an unsigned CBA, as the plaintiff funds had produced CBAs that covered the relevant time period. *Id.* at 313.

\* \* \*

Therefore, the Funds have failed to carry their burden at summary judgment to establish that Nova Crete signed on to the CBA by signing the Purported Contract or manifested an intent to be bound by the CBA through its conduct in 2016. Because the Funds have not met their moving

burden, and because Nova Crete did not cross-move for summary judgment on its affirmative defense of fraud in the execution, the Court need not reach the parties' arguments on the applicability of the fraud-in-the-execution defense.

**B.    The Funds' Evidence in Support of their Damages Calculation**

Having determined that the Funds have not carried their summary judgment burden to establish that Nova Crete was bound to make contributions under the Association CBA, the Court briefly considers the Funds' arguments regarding the amount of their damages.

The parties evidently do not contemplate the Court granting summary judgment with respect to the amount of the Funds damages if the Court did not find for the Funds regarding Nova Crete's liability. Neither party argues or cites authority for the Court to grant summary judgment on the amount of a plaintiff's damages when denying summary judgment on a plaintiff's liability argument, nor did the Court's independent review turn up any authority for the Court to do so. In any event, as noted above, *see* Section I.D, *supra*, the Court is unable to determine how the Funds reached the $1,081,612.58 figure they request in damages. While evidence supports $875,906.50 of the amount the Funds request, the Court is unable to account for $205,706.08 of the request.

Therefore, the Court will not reach the Funds' arguments regarding the amount of damages they would be entitled to in the event they established that Nova Crete was bound by the Association CBA.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs' Motion for Summary Judgment (ECF No. 39) is **DENIED**. All of the legal issues discussed herein shall proceed to trial. An appropriate Order accompanies this Opinion.

**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

Dated: May 7, 2024

26